**WISCONSIN ALUMNI RESEARCH FOUNDATION, Plaintiff,**

v.

**GENERAL ELECTRIC COMPANY, Defendant.**

Civ. A. No. 92–C–653.

United States District Court, E.D. Wisconsin.

March 29, 1995.

Keith V. Rockey, Rockey, Rifkin & Ryther, Chicago, IL, David DeBruin, Kravit, Gass & Weber, S.C., Milwaukee, WI, for plaintiff.

Robert Breisblatt, Welsh & Katz, Ltd., Chicago, IL, John Flanagan, Michael, Best & Friedrich, Milwaukee, WI, for defendant.

## ORDER

TERENCE T. EVANS, Chief Judge.

My thorough familiarity with this case explains my lack of surprise upon learning that the plaintiff thinks it should win $2,863,495 and the defendant thinks it should lose "around $59,000." Bud Selig and Donald Fehr are closer on the issues that divide them than are the attorneys for the parties, the Wisconsin Alumni Research Foundation and the General Electric Company.

On June 26, 1992, the Wisconsin Alumni Research Foundation (WARF) filed this case against the General Electric Company (G.E.) alleging breach of a license agreement and infringement of U.S. Patent Number 4,204,-225 (the Mistretta patent), involving a real time digital X-ray subtraction imaging device. G.E. counter-claimed that the patent was invalid and that WARF, not it, had breached the license agreement. When filed, the case was assigned to Judge John W. Reynolds.

I first met this case on December 27, 1993, when it came to me after Judge Reynolds returned it to the clerk of court for random reassignment. At that time there were motions pending, many relating to discovery issues. I held several telephone and in-person conferences with the attorneys and conducted a rather cantankerous 17–day jury trial on liability issues. The jury trial started on January 27, 1994. I also resolved various motions after verdict, the result being that G.E. is liable to WARF for certain contract and infringement damages. A court trial on the damage issues was held in November 1994. This decision resolves the remaining damage issues and some evidentiary matters as well.

Discovery problems still fester in the case. They have resulted in motions to strike testimony and exhibits. The motions will be denied. The damages portion of this case was a court trial. There is no danger of jury confusion or of prejudice in the admission of the exhibits. With one exception, the issue is the weight to be given to the exhibits and whether it is fair for G.E. to "find" the exhibits either just before or during trial.

To the latter question, I answer "no." In this case G.E. has shown a remarkable tendency not to be able to calculate financial information. At a status conference on January 20, 1994, shortly after the case was transferred to me, I recall being astounded that there was almost no financial data available on which to begin a settlement discussion. Yet on the eve of trial, G.E. came up with certain information on what sales were sales to state and local governments (exhibits 938 A–C and 939 A–C), and on what portion of the Stenoscop involves the licensed technology (exhibits 930, 934, and 936).

The weight to be given the exhibits varies. My assessment of the weight will be clear in the findings of fact which follow this decision. However, with regard to exhibit 930, I feel some comment is necessary now. The exhibit purports to show that the royalty base of the Stenoscop is 14 percent. The document is handwritten; yet no one knows by whom. It was found in a file, but no one knows who put it there—or for that matter why it wasn't found earlier. It deserves no weight and has been given none.

Similarly, the testimony of Neil Mooers is worthy of little credit. Mr. Mooers was called to testify regarding the DF series of machines and whether or not they perform the function of digital subtraction—the essence of the patent at issue. For a number of reasons, his testimony will be given no weight. First of all, he was not an impressive witness. He had not seen the patent. He was relying on what someone at G.E. told him was at issue. But most importantly, he was not called during the liability phase of the trial. The reason, of course, is that G.E. had stipulated that the DF series of machines infringed the patent. They made the stipulation at a conference before Judge Reynolds. The liability phase of this trial was conducted on the basis of that stipulation. No testimony was taken regarding the DF series, and consequently no verdict questions were submitted to the jury on the DF series.

Yet in their motions after verdict, G.E. nonchalantly announced that, of course, not all the DF series devices infringed the patent. I stated in a decision on May 25, 1994:

In a brief filed April 15, 1994, G.E. makes the statement, "G.E. has only acknowledged that the DF devices which use the Mistretta technique fall within the '225 patent, not all DF devices." I am not sure what is implied by this statement. However, if there is any implication that somehow some of the DF devices, using any technology resembling that in the invention, do not infringe the patent, I forcefully reject the possibility. The jury was not asked to consider the DF series precisely because G.E. conceded that if the patent were valid, the devices, if unlicensed, would infringe the patent. That is now the fact.

I will not make what are essentially liability findings in this, the damage portion of the trial.

Having made these general comments, I now turn to my findings of fact and conclusions of law.

### FINDINGS OF FACT

1. WARF is a not-for-private-profit Wisconsin corporation located in Madison, Wisconsin. It was founded in 1925 with the purpose of encouraging and promoting scientific research and investigation at the University of Wisconsin–Madison. Faculty and staff at the university assign rights to their inventions to WARF, which obtains patents on those inventions. WARF in turn licenses rights to those inventions to industry in exchange for licensing fees and royalties. WARF then makes grants to the UW–Madison community to achieve its goals of promoting scientific research.

2. Professor Charles A. Mistretta, a professor of radiology at the university, is the inventor of the patent in suit. He assigned rights to his invention to WARF, which obtained U.S. Patent No. 4,204,225 (the '225 patent) on that invention. WARF has extensively licensed the Mistretta patent, and it ranks among the top ten revenue-generating patents in WARF's history.

3. The Mistretta '225 patent relates to a method of performing what has become known as "digital subtraction angiography" or DSA. By use of the techniques of the '225 patent, portions of an X-ray image, such as

images of bones, having no significance to the treatment of a patient undergoing an angiographic procedure, can be removed, or subtracted, from the X-ray image. This subtraction leaves the X-ray image of the vasculature of interest to the physician unobstructed, thus aiding diagnosis and treatment.

4. The General Electric Company was one of the early licensees under the Mistretta '225 patent. It became a licensee in December of 1981 and continued to pay royalties under the patent until the fall of 1988, when G.E. ceased royalty payments. In June of 1992 WARF terminated the license agreement and brought this lawsuit to enforce its rights.

5. The issues before the court at the November 1994 trial involved two separate claims for damages. The first is the damages due WARF arising from G.E.'s breach of the 1981 license agreement in the period of October of 1988 through June of 1992, when the license agreement was terminated; the second damage claim results from G.E.'s infringement of the '225 patent from June of 1992 to the present.

## CONTRACT DAMAGES

6. The terms of the 1981 license agreement between WARF and G.E. control the calculation of damages owed WARF for G.E.'s breach of contract. The license provides for the calculation of royalties based on sales revenue attributable to the components of the licensed product comprising the Base Royalty Product.

7. A number of issues have arisen in connection with the calculation of royalties based on the license agreement. The first arises from a question raised by G.E. as to whether all of the DF series of equipment infringes the '225 patent. G.E. contends that two models known as the DF 5500 and DF 6000 are excluded in calculating royalties for the DF series because they do not use the Mistretta invention.

8. Another issue arises from the language of the contract itself, providing that sales to the federal government are exempt from royalties. G.E. contends that sales made to

state and local government agencies must also be excluded.

9. A third issue is that of export sales. G.E. argues that, because the sales are made outside of the geographic boundaries of the United States, such sales should not be included in the calculation of damages, while WARF argues that G.E.'s proofs on that issue provide insufficient basis for the court to exclude such sales.

10. Next, there is a dispute as to the royalty base on which to calculate damages for G.E.'s sales of the Stenoscop systems from 1988 to 1992.

*The DF Series*

■ 11. The status of G.E.'s DF series raises interesting issues. The liability portion of the trial of this matter was conducted on WARF's belief and my understanding that G.E. conceded that the DF series used the Mistretta technology. A dispute has arisen because G.E. now wants to limit its concession.

12. The dispute has its roots in a September 17, 1993, hearing held before Judge Reynolds. Among the issues discussed was G.E.'s failure to provide WARF with any discovery concerning the operation of the DF equipment accused of infringing the '225 patent.

13. During the discussion, counsel for G.E., Jerold Schnayer, stipulated that there was no issue of infringement with respect to the DF systems:

> MR. SCHNAYER: ... The DF machines in our view are not involved. Not the issue of infringement on those. It hasn't been raised. We have a license on that. We tendered you the money, and therefore we don't have to—you didn't accept it. That's your problem.

> MR. ROCKEY: Your Honor, if counsel is saying that GE concedes that the DF series infringes if the patents are infringed, if the patent is valid, then I will just shut up on that.

> THE COURT: Yeah, they said they had a license to use it.

MR. ROCKEY: Okay. That's fine. So far up to now GE hasn't been willing to say that.

14. Before the liability trial G.E. attempted to withdraw that stipulation. During trial, however, G.E. once again stipulated, without qualification, that all the DF devices sold by it were covered by the claims of the '225 patent and should bear a royalty if the validity of the '225 patent was upheld. Because of the stipulation, no question was submitted to the jury regarding the DF series.

15. In the post-trial briefing following the liability phase, G.E. attempted to back away from its stipulation respecting the DF equipment. As previously noted, I rejected that attempt in my decision of May 25, 1994.

16. During the damages trial G.E. persisted in its attempt to distance itself from its stipulation. Over WARF's objection G.E. presented the testimony of Neil Mooers, a G.E. engineer, about the operation of the DF 5500 and 6000 systems. He stated his view that the DF 5500 and DF 6000 X-ray systems were capable of performing "real-time integrated mask subtraction" only when the systems ran in "pulse-dynamic" or "pulse-cardiac" modes.

17. Mr. Mooers testified that, to operate in the pulse-dynamic or pulse-cardiac modes, the DF 5500 and DF 6000 devices had to be equipped with an option sold by G.E. under Catalog No. C7407SA.

18. I find that the Mooers testimony is insufficient to relieve G.E. of the stipulation made during the liability trial.

19. The testimony of Mr. Mooers concerning the operation of the DF 5500 and 6000 was equivocal regarding the ability of the machines to perform real-time subtraction. On cross-examination he acknowledged that the DF 5500 could perform real-time digital subtraction in the road mapping mode. Later, he testified that he would need to go back to the technical material relating to the DF equipment to ascertain whether real-time subtraction could be performed in the road mapping mode.

20. More importantly, G.E. cannot be allowed to stipulate to a fact, thus preclude discovery on that fact, not be required to

have a jury pass on the issue at the appropriate time—during the liability trial—and then slip the issue into the damages portion of the trial. I specifically did not present a question to the jury regarding the DF series. Now G.E. acts as if everyone understood all along that the concession was only as to *some* DF machines and as if everyone agrees on which ones. G.E. is acting as if the issue is so clear that there can be no dispute whether or not some of the DF machines use the technology. G.E.'s position is untenable. Nothing in this case has been as simple as G.E. would have me believe this is.

21. Given the record, where G.E. has failed to produce any information concerning the operation of the DF equipment, has twice stipulated that the DF equipment, without qualification, is covered by the claims of the '225 patent, and where the testimony presented by G.E. concerning the DF 5500 and 6000 equipment is equivocal at best, I again reject G.E.'s attempt to relieve itself from the consequences of the stipulation it made during the conference before Judge Reynolds and the liability jury trial before me. All DF systems sold by G.E. subsequent to October of 1988 are properly included in the calculation of damages owed WARF for G.E.'s breach of contract and subsequent infringement of the '225 patent.

*Sales to State and Local Governments*

22. Because the technology of the '225 patent was developed with grants from various agencies of the Federal Government, WARF granted the Federal Government a royalty-free license under the '225 patent. Products sold to agencies of the Federal Government, such as Veterans Administration hospitals, are exempt from royalties. An issue remains, however, regarding whether sales made to state and local governmental entities should also be excluded from the calculation of damages.

23. I find that they should not be excluded based on G.E.'s failure to produce adequate records to enable an identification of state and local government entities to whom it has sold DF and Stenoscop systems.

24. These are records which—if G.E. was accurately calculating the royalties it owed—

it would have in its possession. G.E. has stated that it paid royalties on the sales because that was easier than excluding them.

25. G.E. now argues that WARF could have figured out for itself what G.E. sales were exempt from royalties.

Additionally, having the burden of proof, WARF certainly could have called every hospital on the G.E. list of all sales, yet Mr. Bokhart only called ten facilities and found out that at least four of these were State and Local facilities. (TR 124 and 194.) Because WARF had the ability to determine for itself which facilities were owned by State or Local Governments, but chose instead to remain ignorant in connection with this issue, they should not be heard to complain.

The suggestion defies belief—to say nothing of the discovery rules in the Federal Rules of Civil Procedure.

26. G.E.'s first attempt to identify which of its sales were to state and local government was Kelvin Nevels's classification of sales based upon the tax-free nature of those sales. Mr. Nevels is a financial analyst employed by G.E. since 1979. Mr. Nevels himself, a very honest witness, conceded that there were problems with the methodology used to identify the questioned sales:

Q. When you got those results back in early November, were you satisfied with that?

A. Not with just that dump, no. We also then began to look at the results of that search to determine if there were perhaps some charitable hospitals included in those numbers and began to extract those.

27. The results of Mr. Nevels's early attempt to segregate state and local sales were reported to WARF in the royalty calculations produced by G.E. in October 1994 and were examined by WARF's expert, Christopher Bokhart, as a part of his analysis of WARF's damages claim. Mr. Bokhart was also dissatisfied with the methodology:

Q. Now, did you undertake an investigation as to whether any of the entities which GE reported as a sale to a state

or local government was, in fact, a state or local government?

A. Yes. If I could have you turn again to the page titled types of sales to include, should state and local sales be excluded, I have a half a dozen companies here, organizations that GE has designated as a state and local organization. And based on my investigation they're not. What they are are private not for profit organizations. In fact, you can take a look at the name. And how they made the determination based on the name alone that these are government organizations, I don't know, because there's nothing in there that designates that. And an investigation shows that they're not. And this is just a sample. There are many, many more that are just as obvious.

28. During his testimony, Mr. Bokhart was referring to PX 511, which set forth the names of six entities classified by G.E. as state and local government organizations.

29. Following Mr. Nevels's conclusion that the results obtained by his first attempt at determining sales made to state and local governments were unsatisfactory, he sent the list of sales to G.E. sales offices around the country for regional management to review and note sales to state and local government entities. I find the result of this attempt to be unconvincing.

30. No exclusion of those sales classified by G.E. as state and local sales from the damages calculation in this case is warranted.

31. Furthermore, I find that most sales to local and state governments are not royalty-free under the federal license. The relevant portion of the license granted by WARF to the United States Government states as follows:

The Licensor, in consideration of the premises and other good and valuable consideration, hereby grants and conveys to the United States Government a nonexclusive, nontransferable, paid-up license to make, use, and sell the invention throughout the world by or on behalf of the Government of the United States and states

and domestic municipal governments under the aforesaid patent application, and any and all division or continuations, and in any and all patents or reissues which may be granted thereon during the full term or terms thereof.

32. The party to whom the royalty-free license was granted is the government of the United States. The Federal Government is granted that royalty-free license to "make, use, and sell the invention throughout the world" on behalf of itself and on behalf of "states and domestic municipal governments." The royalty-free license only applies when the equipment in question is acquired by the Federal Government.

33. In fact, this is how G.E. acted prior to litigation. G.E. paid royalties on state and local government sales under its license agreement with WARF. Counsel for G.E. argued, however, that such payments were made "because it was just easier to write a royalty check."

34. WARF's Thomas Hinkes, responsible for administering the licenses under the '225 patent, testified that G.E. never notified WARF that G.E. was withholding royalties pursuant to the royalty-free government license.

35. Mr. Hinkes also testified that his interpretation of the language of the agreement obligated payment of royalties to WARF unless it could be shown that the licensed product purchased by the state or local government entities was purchased using federal money.

*Export Sales*

■ 36. Under the license agreement, G.E. was licensed not only under the '225 patent, but also under foreign counterpart applications and patents, including a French counterpart patent, Patent N. 7913277.

37. G.E. contends that export sales should not be included in the royalty base. However, G.E. has been unable to document that such an exclusion is proper.

38. During discovery on the damages issues WARF deposed Mr. Nevels, who indicated that all the sales listed in PX 500 are included on the books of GE Medical Systems:

A. Sales listed here [PX 500] are those listed in the mainframe that reflect on the parent's books, GE Medical Systems' books.

39. He also testified that an international group within GE Medical Systems prepares equipment for delivery to the ultimate purchaser, and that at least part of the international group is located in G.E.'s facilities in Waukesha.

40. He confirmed that all profit derived from sales of Stenoscop devices, regardless of the purchaser's location, is ultimately profit on the books of G.E.

41. It was Mr. Nevels's testimony on which Mr. Bokhart relied in including export sales in his calculation of damages. Mr. Bokhart testified that the earning of profits by GE Medical and the booking and administration of export sales by GE Medical in the United States was, from an accounting point of view, the recognition of a sales transaction.

42. Based on the record before the court, it would not be proper to exclude export sales from the royalty calculation. The only evidence to that effect is G.E. employee Mona Theobald's conclusory testimony that the sales transactions occur outside the United States where the end customer is located. That testimony appears to be based simply on the fact that G.E. employs salespersons in locations outside of the United States. I do not view that testimony as dispositive.

43. Moreover, the information to clearly determine where a "sale" occurs for purposes of the patent statute lies entirely within the possession of G.E.

*Stenoscop Base Royalty Product*

■ 44. G.E. admits that 100 percent of the sales revenue derived from the DF system is attributable to the Base Royalty Product. Thus, the only issue is the base for the Stenoscop product.

45. WARF's expert, Mr. Bokhart, testified that, to the extent possible, he used the definition of the Base Royalty Product in the license to determine WARF's damages for G.E.'s breach of the agreement.

46. When Mr. Bokhart analyzed the information provided by G.E. in discovery and formed his opinion regarding the Base Royalty Product shortly prior to trial, the only information available to him was PX 500, various price lists published by G.E. for the Stenoscop device sold from 1989 to the present (PX 503), and the testimony of Mr. Nevels, G.E.'s 30(b)(6) witness.

47. During discovery Mr. Nevels testified that, to his knowledge, no records existed relating to the cost of the Stenoscop so as to allow allocation of the Stenoscop sales revenue between the components comprising the Base Royalty Product defined in the license agreement and the remainder of the Stenoscop device.

48. With the information he had prior to trial, the only deduction Mr. Bokhart could make from the Stenoscop sales price was the sales price of a mobile X-ray unit listed in G.E.'s price lists.

49. At trial, G.E. called its marketing manager for the Stenoscop product, Mona Theobald. Ms. Theobald stated that the mobile X-ray unit listed in the G.E. price list had no relationship to the stenoscop device.

50. Based on Ms. Theobald's testimony, Mr. Bokhart recalculated the WARF damage claim for the Stenoscop product. The new calculation made no deduction for the X-ray generator based upon the mobile X-ray unit information shown in the G.E. price lists. The new calculation increased WARF's damage claim for G.E.'s breach of contract from $523,462 to $717,298.

51. At trial, G.E. produced for the first time, documents to support its position on the apportionment of the Stenoscop sales revenue to account for the Base Royalty Product definition contained in the license agreement. I allowed testimony on G.E.'s theories using defendant's exhibits 930, 934, and 936, the newly produced exhibits, but indicated that I would entertain WARF's objections to these exhibits as part of WARF's post-trial submissions.

52. WARF has filed objections to these exhibits. Although I am very skeptical of G.E.'s explanations for the timing of the discovery of these documents, I have received them as noted above. As I stated, I am giving no weight to exhibit 930. Exhibits 934 and 936, however, present crucial facts on which to make an accurate judgment as to the proper amount of damages. Unlike exhibit 930, there is information on the source of the documents.

53. G.E. presented two alternative theories respecting allocation of the Stenoscop sales price to arrive at the Base Royalty Product under the license agreement. First G.E. said the Base Royalty Product should be equal to 14 percent of the total sales price of the Stenoscop device. This ratio approximates the sales price of the image processing option offered for sale in connection with early models of the Stenoscop, without which the Stenoscop was incapable of performing the subtraction techniques of the '225 patent.

54. However, the price lists produced by G.E. show that the use of G.E.'s proposed ratio of 14 percent would not account for all the components listed as forming the Base Royalty Product.

55. G.E.'s second theory is that the Base Royalty Product is equal to 24 percent of the sales price of the Stenoscop and is based on defendant's exhibits 934 and 936. Ms. Theobald testified at trial, with reference to these exhibits, that the components comprising the Base Royalty Product defined in the license agreement were found in subassemblies, the cost of which amounted to 24 percent of the entire cost of the Stenoscop device.

56. The evidence supports a finding that the Base Royalty Product of the Stenoscop device is 24 percent.

57. My calculation of contract damages is as follows:

DF and Stenoscop Sales 1988 Through June 1992

| | |
|---|---|
| DF Domestic Trade Sales | $15,755,118 |
| DF System State and Local Sales | 1,667,081 |
| DF System Export Sales | 1,804,623 |
| Total DF Sales | $19,226,822 |

| | |
|---|---:|
| Stenoscop Domestic Trade Sales | $18,243,311 |
| Stenoscop State and Local Sales | 5,299,008 |
| Stenoscop Export Sales | 3,195,768 |
| Total Stenoscop Sales | $26,738,087 |
| 24% of Stenoscop Sales | 6,417,141 |
| Total Royalty Bearing Sales | $25,643,963 |
| 2% Royalty on Sales | 512,879 |
| Less Partial Payment by G.E. | −200,000 |
| Total Contract Damages | $ 312,879 |

## INFRINGEMENT DAMAGES

■ 58. The remaining damage issue is whether WARF's claim for damages for G.E.'s infringement of the '225 patent is controlled by the royalties in existing licenses that WARF has granted under the '225 patent. If so, WARF's damage claim for infringement would be calculated in the same fashion as its breach of contract claim discussed above. If not, the issue is what are the "damages adequate to compensate for the infringement." 35 U.S.C. § 284.

59. As discussed above, WARF has granted 13 licenses to the '225 patent, all but one of which contain identical royalty provisions for direct sales of the licensed product. G.E.'s expert, George R. Clark, stated:

Q. Now, do you have an opinion as to whether this many licenses create an acceptable royalty rate?

A. Yes, I do.

Q. And what is your opinion?

A. ....

However, when one finds a series of license agreements where the terms are the same, the product is the same, in my opinion, it's the best evidence of what a reasonable royalty would be, especially in the field where the licensees by-and-large are not unknown entities, they are major players in the field.

Q. So it's your opinion then that the two percent royalty was an established royalty for this product and for this patented technology?

A. Yes, sir.

60. Another license, to Camtronics, is presently under negotiation. It contains a 3 percent to 4 percent royalty clause, compared to the 2 percent and 3 percent rates of the other licenses.

61. WARF argues that the existing WARF licenses are a factor to consider in determining a reasonable royalty for WARF's infringement, but that the existence of the licenses did not create an established royalty rate for the '225 patent.

62. Mr. Bokhart, WARF's expert, viewed many of WARF's existing licenses to be "tainted" in one fashion or another, precluding them from establishing a royalty rate. Of the 13 licenses, 9 were entered into as a result of litigation during which the validity of the patent was contested by accused infringers who later became licensees. Two other licenses, those to Toshiba and Hitachi, resulted from negotiations that took place while third-party litigation was pending, again while the validity of the WARF patent was being contested. The presence of the litigation issues made it very difficult for WARF to demand royalties higher than those set forth in the G.E. agreement.

63. The other two licenses, to Philips and G.E., were entered into before the product had been commercialized and while Philips and G.E. still faced a significant investment of time and money to transform the invention of the '225 patent from a laboratory tool to a commercial product.

64. Both George Clark, an intellectual property attorney called by G.E., and Mr. Bokhart testified concerning the factors listed in *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y.1970). Mr. Clark testified that if a reasonable royalty

was established through WARF's licenses, the other factors set forth in *Georgia–Pacific* need not be considered.

65. Mr. Bokhart offered testimony concerning several of the *Georgia–Pacific* factors and as to the existing licenses on the '225 patent. For example, he reviewed other WARF licenses in the medical equipment area that carried royalties as high as 10 percent. Reported decisions respecting medical equipment patent litigation disclose royalties as high as 25 percent.

66. Mr. Bokhart also analyzed G.E.'s use of the patented technology and discussed how G.E. had made over $150 million in sales of products incorporating the invention of the '225 patent.

67. The record also shows that G.E. makes a profit on services that are sold in conjunction with the Stenoscop device.

68. Ms. Theobald stated that G.E. also finances and leases Stenoscop devices; although she did not know the profit derived from these activities, she testified that G.E.'s financing organization is profitable.

69. WARF's expert, Mr. Bokhart, testified that the revenue generated by G.E.'s sales of service contracts and the financing of the Stenoscop fall into the *Georgia–Pacific* category of "convoyed sales." Although G.E. did not supply details of the profit made from its service contract and finance activities that are directly associated with the Stenoscop product, based upon G.E.'s annual reports, Mr. Bokhart estimated that for every $1 million in sales of Stenoscop products sold, G.E. sold an additional $290,000 in service contracts and received $500,000 in revenue from financing the device.

70. In addition to discussing various factors under the *Georgia–Pacific* analysis, Mr. Bokhart also testified that he employed other methods of determining the level of a reasonable royalty in arriving at his conclusions of WARF's damages claim for G.E.'s infringement.

71. After considering several approaches and the factors enumerated in *Georgia–Pacific*, Mr. Bokhart concluded that a reasonable royalty rate in 1992 would be 6.5 percent of the net sales price of the DF and Stenoscop devices.

72. Having considered various factors presented on this issue, I find that 6.5 percent is too high but that 2 percent reflects too many problems in licensing the technology due to pending lawsuits. A reasonable rate is the rate currently being negotiated with Camtronics—3 percent and 4 percent. I will set the rate at 3.5 percent.

73. Using the same methods as those used for contract damages, *i.e.*, applying a 24 percent royalty base for the Stenoscop and including all but Federal Government sales, but applying a 3.5 percent royalty rate, the calculations are as follows. Some of the figures come from exhibit I to plaintiff's brief, p. 50, which provides sales figures. The page is subtitled "Option 2: Royal Base *Includes* X–Ray Excluding Federal Government Sales." The exhibit then states "(*excl.* X-ray)" (emphasis added), which I believe is an error. The figures on the exhibit include the X-ray. For the Stenoscop, these are the figures on which I am applying the 24 percent royalty base. The calculations are as follows:

|  | Sales |  |
|---|---|---|
| DF Series |  |  |
| 7/92–12/92 | $ 715,846 |  |
| Total |  | $ 715,846 |
| Stenoscop |  |  |
| 7/92–12/92 | 6,663,083 |  |
| 1993 | 12,435,296 |  |
| 1/94–9/94 | 7,892,030 |  |
| Total | $26,990,409 |  |
| 24% royalty base |  | $6,477.698 |
| Total |  | $7,193,544 |
| 3.5% royalty rate |  | 251,774 |

Total infringement damages by this calculation equal $251,774.

74. WARF seeks prejudgment interest on both the contract and infringement claims. G.E. does not dispute that prejudgment interest is appropriate on the infringement claim. It does, however, contest a grant of interest on the contract damages. G.E. contends that the license does not provide for interest on late royalty payments.

I find an award of interest to be appropriate.

## INJUNCTIVE RELIEF

75. WARF has requested an injunction barring further infringement of the '225 patent by G.E.'s continued sale of the Stenoscop system.

76. G.E. opposes the injunction, stating that the invention claimed in the '225 patent was developed with government funding.

77. In addition, G.E. points to the institutional patent agreement between the United States and the University of Wisconsin. Paragraph VI(c) of that agreement states that inventions covered by the agreement shall be made available "through licensing on a nonexclusive, royalty-free or reasonable royalty basis to all qualified applicants."

78. I find that WARF has fulfilled its obligation to make the invention of the '225 patent available to the public by granting GE a license in 1981.

79. Moreover, the public would not be seriously affected by the grant of an injunction in this case. Other manufacturers are marketing the product.

80. In light of the clear public interest in preventing infringement of valid patents, I will grant the request for an injunction.

## CONCLUSIONS OF LAW

1. Damages for breach of contract are measured by the expectations of the parties. The nonbreaching party is entitled to full compensation for the loss of its bargain, namely, losses necessarily following from the breach which are proven to a reasonable degree of certainty and are within the contemplation of the parties (*Handicapped Children's Education Board of Sheboygan County v. Lukaszewski*, 112 Wis.2d 197, 206, 332 N.W.2d 774, 779 (1983); *Thorp Sales Corp. v. Gyuro Grading Co.*, 111 Wis.2d 431, 438, 331 N.W.2d 342, 346 (1983)). A proper amount in this case is $312,879.

2. Compensation for infringement of a United States patent is governed by 35 U.S.C. § 284, which states:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

3. In fixing compensation to a patentee for infringement, a reasonable royalty set forth in section 284 is a "floor below which the courts are not authorized to go" (*Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1326 (Fed.Cir.1987); *Bandag, Inc. v. Gerrard Tire Co.*, 704 F.2d 1578, 1583 (Fed.Cir.1983)).

4. The methodology of assessing and computing infringement damages is within the sound discretion of the court (*Nickson Industries, Inc. v. Rol Mfg. Co.*, 847 F.2d 795, 798 (Fed.Cir.1988); *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 898 (Fed.Cir. 1986)).

5. A damage award for patent infringement must be adequate to compensate for the infringement (*Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1563 (Fed.Cir.1983)).

6. Any risk of uncertainty in calculating damages should be borne by the infringer and not the injured party (*Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d 1056, 1065 (Fed.Cir.1983)).

7. Many factors are considered in determining reasonable royalty damages under section 284. Several of the more generally recognized factors considered by the courts are set forth in *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y.1970).

8. The best measure of a reasonable royalty is the established royalty paid by licensees for the invention (*Nickson Industries, Inc., supra* ). Where, however, factors exist that depress the royalty that can be negotiated by the patent owner, such as widespread infringement, a higher figure may properly be awarded (*Nickson Industries, Inc., supra; Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 533 F.2d 126, 129–30 (3d Cir.1976)).

9. Applying the factors set forth in *Georgia–Pacific, supra*, to the facts of this case, I conclude that a 3.5 percent royalty applied to the net sales price of the DF and Stenoscop

devices is a reasonable royalty that will adequately compensate WARF for G.E.'s infringement.

10. Judgment will be entered on WARF's claim for patent infringement in the amount of $251,774 against G.E.

■■■ 11. Prejudgment interest in a breach of contract action can be awarded in a proper case as an element of compensatory damages (*Wyandotte Chemicals Corp. v. Royal Electric Mfg. Co.*, 66 Wis.2d 577, 582, 225 N.W.2d 648 (1975)).

■■■ 12. Prejudgment interest can be awarded if the amount of damages is ascertainable prior to a judicial determination. In other words, where there is a reasonably certain standard of measurement that, when correctly applied, will allow calculation of the amount owed, an award of prejudgment interest is proper (*Klug & Smith Co. v. Sommer*, 83 Wis.2d 378, 265 N.W.2d 269 (1978); *Wyandotte, supra*).

■■■ 13. Here, the license agreement, as discussed above, set forth the method of calculating the royalties owed WARF under the contract. Hence, G.E., the breaching party, could with reasonable certainty have determined to WARF's satisfaction the amount owed WARF for its sales of DF and Stenoscop devices by application of the contract's terms; indeed, G.E. did make acceptable payments for approximately six years before the dispute with WARF arose. Consequently, an award of prejudgment interest on the contract is proper here.

■■■ 14. Prejudgment interest on the infringement award is also proper (*General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 656, 103 S.Ct. 2058, 2062–63, 76 L.Ed.2d 211 (1983)).

15. Judgment will be entered for WARF for $312,879 on its breach of contract claim, $251,774 on the patent infringement claim, for a total of $564,653 plus prejudgment interest. Within 10 days, WARF should submit a calculation of prejudgment interest at the prime rate. Judgment will then be entered.

■■■ 16. The decision to grant or deny a request for a permanent injunction is within the discretion of the court (*Windsurfing International, Inc. v. AMF, Inc.*, 782 F.2d 995, 1002 (Fed.Cir.1986)). However, injunctive relief is usually granted (*W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 842 F.2d 1275, 1281 (Fed.Cir.1988); *KSM Fastening Systems, Inc. v. H.A. Jones Co.*, 776 F.2d 1522, 1524 (Fed.Cir.1985)). The Court of Appeals for the Federal Circuit has held that an injunction should issue once infringement is found, absent a sufficient reason for denying the injunction (*W.L. Gore, supra; Windsurfing International, supra; Trans–World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1564 (Fed.Cir.1984)).

17. Accordingly, defendant General Electric Company and its officers, agents, directors, employees and attorneys, its successors and assigns, and all persons in active concert or participation with any of them, shall be and hereby are permanently restrained and enjoined from further infringement of United States patent No. 4,204,225 by making, using, or selling within the United States the DF and Stenoscop X-ray systems, or any colorable variation thereof.

18. WARF shall recover its costs.

SO ORDERED.